United States v. Sheikh. Mr. Gilbert. Good morning, Judges Wilkinson, Motts, and Shedd. And may it please the Court, I'm Joseph Gilbert, and I represent Basit Sheikh in this case. The District Court clearly erred when it ruled that the government had proven, by clear and convincing evidence, that it should be allowed to override Mr. Sheikh's fundamental right to refuse powerful, mind-altering chemicals for the sole purpose of rendering him competent for prosecution. The government's burden is intentionally high in these cases, clear and convincing, because it is only for the government's convenience that they seek forcible medication. And for this reason, the government must establish all four prongs of the test enunciated by the Supreme Court in the Sell decision. The government has established only that lesser drastic alternatives to forcible anti-psychotic medication will not restore Mr. Sheikh's competence so that the prosecution may proceed. What we could refer to as prong three in this case. The District Court did not require the government to establish prong two. That is, that it is anti-psychotic medications in this case would make Mr. Sheikh competent. In fact, in the joint appendix, at page 114, the prosecution literally asked no questions of their witness, the psychiatrist Dr. Williams, after he stated his opinion that the proposed treatment in this case is substantially likely to restore competence. The report and testimony only showed that the proposed treatments are generally effective to treat schizophrenia, something which this court pointed out as recently as the Watson case at page 424, when it made it very clear that you can't just simply say, this is typically the kind of medications that the psychiatric community would like to use for this particular how and why this is going to make this person substantially likely to make him competent. Dr. Williams essentially relied on general treatment, joint appendix page 124, and on retrospective chart studies on the joint appendix page 125. There's simply no how or why Dr. Sheikh would make Mr. Sheikh competent to proceed. You agree that the standard of review is a clearly erroneous one? It is as to the prongs two, three, and four, Your Honor, for clear error. As to prong one, it's de novo. This court can decide whether the first prong, that is, that the government has a legitimate interest in the prosecution, and that interest has not been mitigated by other special circumstances. Ordinarily, prong one... set in the Evans case? Well, this court enunciated it in Evans, Your Honor, but of course the Supreme Court made it in the Sealth. This is 10 years of statutory maximum was presumptively serious? Yes, and Your Honor... to establish a substantial interest on the part of the government, and here we have 15 years? Yes, Your Honor, and in fact, I think that the court properly recognized that the government has a very legitimate interest in prosecuting cases. So then we're left with prongs two, three, and four, which is a clearly erroneous standard. Well... If the prong one is subject to de novo review, and we have a previous case saying 10 years statutory maximum establishes a significant interest on the part of the government, and then you have a 15-year statutory maximum here, why doesn't that sort of wrap it up? That satisfies half of it, Your Honor. Again, I'm willing to concede that even though the court was imprecise, and the doctors in this case were imprecise when they named the charge, because Mr. Sheikh is actually indicted for attempting to assist terrorism by going to the airport to get on a plane. That's a difference. I'm sympathetic about not just rushing people through, but there is a serious, there is a significant interest here in trying these cases promptly, just in not keeping witnesses in limbo, and also in having these cases criminally prosecuted as opposed to proceeding through the process of civil commitment. Civil commitment orders are very, they're hard to get, and they're hard to make stick. So, then I'm left with, was this a case where the district court just tried to rush it through, or was this one where there was, where the district judge actually took some time with it and went through the different cell factors? And here, as I counted up, there were three, he ordered three different competency reports, and he had three hearings, actual three hearings on competency. And then on top of that, he had an involuntary medication hearing at which a number of expert witnesses testified. So, between the competency hearings and the involuntary medication hearings, this was not one of those matters that was on an express train. The district court took some time with it, did it not? Certainly time passed in this case, Your Honor, from the time that Mr. Sheikh was first arrested on November 2nd. But if I could, I think that the fact that the court took time still does not address the fact that... It wasn't just that he took time. I mean, the time, he wasn't twiddling his thumbs. He didn't resolve this on a cold record either. He had three different competency hearings, and at the involuntary medication hearing there were a number of experts, and he decided on the credibility of the experts and, you know, seemed to give some decent reasons for using Haldol, which was that the side effects seemed to be minimal and it would reduce the risk to the individual himself and to staff and that Haldol was not an experimental drug, but it was frequently administered when criminal defendants or patients were aggressive and posed a risk to themselves or others. So I don't know what... I guess I'm left with the question of what exactly was the district court supposed to do that it hadn't already done? I mean, what was it supposed to do? Except reach a different conclusion, in your view, but, you know, we don't have the testimony before us. Well, Your Honor, if I can, I want to clarify a couple of things. First of all, with respect to civil commitment, I've done most of the civil commitment cases in our district, and our district does the lion's share of civil commitment cases because FMC Butner is located there. And under civil commitment procedures, the government simply has to prove two things, that the person suffers from a mental disease or defect, and that as a result of that, that they would present a substantial danger of either bodily injury to another person or serious property damage to the property of another if they were released. And I can tell you, just like Mr. Watson, the person whose case was reversed last year by this court, he's going to have his civil commitment hearing in July. And I'm fairly confident he's going to be civilly committed, just as I'm confident that in this case Mr. Shake will be committed. And if you compare from a pure perspective of the government's interest, 15 years to a person who's 32 years old of Pakistani descent, and then we're going to release this person back to the United States, presumably better because he'll be treated in prison for mental illness as well, as opposed to an indefinite civil commitment, it's our position that the government's interest is better met with that alternative. Now, as to the medications... That's not the way the precedent reads. The precedent, Your Honor, is solely about... Has a person literally served all that much time? But again, that only speaks to half of that prong, Your Honor. The second half of the prong is, is there something else that therefore mitigates the government's interest? And my position in this case, usually we concede prong one. But in this case, my position is that we don't need to concede prong one because the government's interest will be satisfactorily served by civilly committing Mr. Shake. I'm sorry, so you do concede prong one? I don't concede prong one. Ordinarily, I concede prong one, Your Honor. I concede that it's a serious interest in prosecution... But you just said the government's interest would be better served by civilly committing him. That mitigates. You're arguing for... What are you arguing for? I'm arguing, Your Honor, that the government's strong interest in prosecuting terrorism cases, which I concede, is sufficiently mitigated in this case because of the special circumstance available to the government. The doctor, Walden Weaver, testified, we will move for civil commitment in this case if we're not allowed to medicate him because he's clearly not going to do it. Well, that's the impression that the government, that the seriousness of the government's interest was bottomed out on whether they're on the criminal prosecution and the statutory maximum for the criminal prosecution plus the general interest in prosecuting terrorists, not civilly committing them but in prosecuting them, and also the interest that is served by bringing any prosecution to a prompt conclusion. That's why we have a speedy trial act because it exists to serve that interest. I wasn't aware that we addressed prong one, specifically by trying to weigh all the pros and cons of a criminal prosecution versus the pros and cons of a civil commitment order and the like, and particularly because the civil commitment order, both in terms of whether it can be procured and how long it can be. These things are reviewed periodically. I don't know how long it would be imposed, but it's sort of an iffy. The civil commitment route is sort of iffy, and so I'm not all that sure of how civil commitment as an alternative should play into prong one where there's a significantly and stiff statutory maximum that Congress has attached to the offense. That's what I'm saying is the civil commitment stuff is iffy, it's speculative, and I don't understand why it bears on prong one particularly. Your Honor, it bears on prong one because it's my position on behalf of Mr. Shake that the only government interest that's not satisfied by civil commitment, which they will seek in this case, is retribution. Mr. Shake will be incapacitated. In fact, the trial judge himself— We don't create that interest or decide that interest de novo, do we? Don't we give some deference to the executive branch on the government's interest in prosecuting somebody? Or is your view that we just decide whether or not? No, Your Honor, that's not my view. I agree with you that the standard is de novo, but all I'm saying is— A de novo review of what the government presents as their interest. And whether there are special circumstances that mitigate it. Correct. But there'd be some deference given to the executive branch charged with prosecuting cases as to what they think the government interests are, speedy trial, witnesses, availability, those kind of things. And then we review that to see if their representation of government interest, we review de novo to see if that meets their requirement. But we don't have to decide whether or not there is an interest, do we? I suppose another way to put it, Your Honor, is that you don't have to agree with the district court when it says as— No, but I know what de novo review means. But the district court said on joint appendix 151, and this was in the order, civil commitment would present minimal chance that Shake would be released to the community. You don't have to agree with the district court as—you have to accept the district court's position there, I think. But I don't think you have to agree that it is, in spite of the fact that he would not be released to the community after civil commitment, that that's not enough, is all I'm saying. With de novo review, this court can just as easily say, do you believe that— we believe it's the government's interest to prosecute because of—we can sort of state the reasons they've stated. We review that and go, we find that is a governmental interest. We don't go, no, that's not a governmental interest. We have to defer to them in some way, don't we, that they have the authority to state what that governmental interest is. We may find it falls short or something. Yes, Judge Shedd. And also, I think that, in effect, the way the cases have evolved since Cell, and particularly in this court and Evans and the others, it was kind of easy, really. The government rarely charges anybody that can't be prosecuted and confined for at least ten years, at least in the Eastern District of North Carolina. Most of our prosecutions are cases that every judge would say, well, that's a significant government interest. That's a serious crime. Although I think in our cases said, for example, if you have a fraud, if you have something that's a paper crime, it may not come within this, even if it's a ten-year sentence. Yes, Your Honor, the White case. So we don't have either one of those here. We haven't— No, it's a— We're exceeding 15 years, and we don't have a paper crime. It's a serious crime. I'm simply suggesting that it is sufficiently mitigated by civil commitment. That's our position on it. To your argument that perhaps the medical testimony wasn't specific enough to your client, how do we factor in that if the client is not cooperative with the authorities who want to test or decide that? How do we factor that in? Your Honor, I've thought a lot about that, and I think that that's one of the reasons the Supreme Court says that these type of cases will be rare, because it's difficult to say in virtually all of these cases— the medical expert testimony is too generalized. We need to have it specific as to the effect on my client or use on my client, which is an argument you're making. How do we factor in, in your opinion, how do we factor in the fact that your client won't cooperate with the authorities to let them get a more specialized individual comment on the medicine? Well, I think, Your Honor, what you can do is, obviously, you have to look at the facts of how the government has proceeded with this and the medical personnel have proceeded with this particular individual. In this case, Dr. Williams— To follow up on that question, can you find an individualized—make an individualized assessment? You don't want to have to administer. Can you make an individualized assessment without actually administering the medication? What's wrong with saying in the case of an uncooperative client, well, this is what the general population studies show. The best way to render an individualized assessment is to actually try the medication out, at least on a trial basis or whatever, but that's not really possible here, is it? Nor is it the law, Your Honor. In fact, that would defy all of the controlling— Well, that's what I'm saying. Exactly. So that's not an option to them. That's not open. Your Honor, there are a number of options open to them. You can meet with the individual. You can have a physical exam. You can run lab tests with or without their cooperation. What's the medical or physical exam, as I read this record? That's what Dr. Williams said, Your Honor. You're correct about that. I'm suggesting only in response to Judge Shedd's question, though, that a person may or may not cooperate, but at least there are other things that can be done. You can look at their prior records, whether they've been treated before, such as in the Watson case, et cetera. I see I'm out of time, Your Honor, and I only have a few minutes for rebuttal, but I just want to make sure that it's clear that— Can you give us that point on rebuttal? Yes, sir. But, again, I just want to also point out— I'm interested in hearing— I'm sorry. I'll be happy to answer it now if you'd like, Your Honor. No, no, no. I just thought you just had a conclusory sentence. Is that what you were doing? You were just saying, I just want to say one thing. Well, all I wanted to— I haven't given you much of a chance. All I wanted to say is that my argument did include aspects of all prongs, and I did want to make sure the Court didn't think that because I focused on prong one today, somehow or another the government ended up thinking that that's— We read your brief. We don't think that. We sort of limited what you got to say because we asked you questions. Yes, sir, and I'm here to answer your questions. Thank you. I think I have a minute or two on rebuttal. Thanks. Mr. Rubin. Mr. Rubin, I think you can take it that they preserved all of their objections to all four prongs, at least as far as I'm concerned. You don't have to waste a lot of time talking about that. Yes, Your Honor, you mean on the standard of review on appeal? I will simply state that we think that we will prevail under the clear error standard of review that you would apply in any case. I thought there was a suggestion in your brief that they hadn't made an argument with respect to all four prongs or they hadn't preserved their argument or something. I think they have. I think a reading of this record. We did argue that, Your Honor, and I will stand by that argument, but I will take Your Honor's cue, and I will not press it here today because we think we prevail under clear error, and the Court won't even have to decide that question. May it please the Court, we recognize that involuntary medication is a serious and a solemn issue, and it's not something to be undertaken lightly. But just as the Supreme Court recognized that instances of involuntary medication may be rare, it also recognized that there are appropriate circumstances. And this case presents those circumstances. How do you win under prong one? What's our review and how do you win under one? Your Honor, it's de novo under prong one. However, any factual findings underlying that, of course, would be reviewed for clear error. De novo review of your assertions of government interest. Your Honor, I think to your point with my colleague, the government, the executive branch has to have some deference to our views on what is important, and I would very strongly disagree with my colleague that retribution is the only interest that this would serve. And I do think that that decision by the executive is entitled to substantial deference. This Court doesn't have to just take us at our word, of course. But at the same time, when we decide to prosecute cases, that involves an important weighing. And I think Judge Shedd's question was suggesting that there's a little bit of a separation of powers question here in respecting a prosecutorial, the exercise of prosecutorial discretion. I mean, it doesn't cut off our review, but it does frame it. I think that's exactly right, Your Honor. And I would say our interest in this case, obviously the nation has been combating terrorism now for some time, and the threat in particular of terrorism from people traveling to Syria and joining with terrorist groups is very high. And this is a priority for the executive branch, and not just for retribution. These cases in prosecuting material support for terrorism provides deterrence for other people to pursue that route. It provides public safety when we can stop people from pursuing that route. Those interests demand a prosecution here, and not an indefinite civil commitment. So I would start, it does have two parts, and I understood my colleague to concede that we have an important interest. He just thinks that it's been undermined by the fact that civil commitment is a possibility here. So in order not to leave that as simply taken, this crime has a statutory maximum of 15 years. In Evans, this court said that 10 years was a serious interest under any reasonable standard. I don't mean you have to spend all your time on that, but I did want you to address it. Absolutely, Your Honor. I didn't want to make that your whole argument, but since we talked about that, and I had a question about the other side, as Judge Wilkins has talked about. There is some separation of powers issue in there, and we don't decide it ab initio whether or not there's a government interest. We have to review something to review something that's the government's position. I take it. That's right. But I don't want to belabor the point if you want to move past it. I'll move past it very quickly, and I think terrorism. We understand all that, and I think Judge Shedd's point is well taken with regard to Prong One. My concern is that we just don't rush these things through, that this is a sober decision, and that involuntarily medicating people is not the course of first resort. It can't be. So tell us why you think the district court approached this carefully. Your Honor, as you mentioned, there were three different competency reports, including the third one, which is really the main one that the cell test relied on, is 15 single-space pages of analysis of defendant, the specific drugs to be used, the specific condition, the specific side effects, their frequency, and how they would deal with those side effects. Did you try to make, I mean, sometimes individuals have unique medical histories that may make them more or less susceptible to certain side effects and everything. Was this some individualized analysis undertaken here? Yes, and that is something that I think the parties very deeply disagree on. I think this was a very much individualized analysis, and I'd like to break down exactly how I think it's individualized. Tell us how you think it was individualized. First of all, this court has said that it needs to be focused on the defendant's specific diagnosis and not just psychosis generally, and I think that was taken to heart by both the doctors in this case and by the district court. The defendant is diagnosed with schizophrenia, and that has its advantages in this analysis because schizophrenia is the one that these drugs are generally approved for. The other diseases are far less studied. Schizophrenia is the main diagnosis that we have experience with these drugs on. So to start with, we started with this defendant's specific diagnosis. You'll have seen in the record two studies, the LADS study and the Cochran study. These were discussed in the third forensic report, and then Dr. Williams testified extensively about them at the hearing, and the Cochran study is the one that I would focus the most on. It looked at 133 incompetent federal defendants who were allowed under cell to be involuntarily medicated between 2003 and 2009. Overall, 79% of them were restored to competency. But to make this more individualized, 76.5% of schizophrenic patients were restored to competency. I would also add that if you look at that study, 41% of the patients were treated with Haldol, the exact drug that is recommended here. It was actually the most used drug for these kinds of things. How were the other schizophrenic patients treated? I'm sorry, Your Honor? How were the other non-Haldol? There were about nine different drugs that are used. Is Haldol the most common? It was the most common. It was 41% of the overall population was treated with that. No other drug was used more than 41% of the time? The next two combined were less than 41%. And I would also add that half of the population was treated with first-generation antipsychotics, which is Haldol and Perlixin, the two that were recommended here, Perlixin being the alternative. And the other half was treated with second-generation. And I'll return to that because that's also important. During my colleague's argument, Judge said you asked how do we factor in noncompliance. Noncompliance is part of the individualization because the fact that we cannot obtain labs from this defendant, and we can't. They've tried. They tried to meet with him on ten occasions in preparing the third forensic. What is a noncompliance? A refusal to talk or a refusal to just thrashing? Or is it physical resistance? Or what is the? It's all of the above, Your Honor. It depends on the timing and it depends on. But he's ranged from being out of control. He actually had to be forcibly medicated twice after the district court's order as a safety reason. But it also includes things just refusing to talk, refusing to submit to physical exams, and refusing to submit to labs. Now, Dr. Williams testified specifically as why that was important because you have essentially two categories of antipsychotics, first-generation or typical antipsychotics and second-generation or atypical antipsychotics. And he said he chose the first-generation ones for two reasons. The first is because this defendant won't submit to labs, he needed to pick a drug whose side effect profile is something they can more readily observe without getting blood tests. The second-generation drugs, he explained, have a higher incident rate of metabolic effects, a kind of side effect you really need to be drawing blood in order to make sure is not happening. Since they can't get that, he said his first choice would be a respiradol. That's a second-generation drug, he said, because we can't get labs, that's not a safe option here. The first-generation drugs have more of what are called movement side effects, and there are things that Dr. Williams testified are very easy to observe, particularly in an inpatient environment where they can watch him all the time and they can monitor for those effects and make adjustments. That's individualization right there. That is a choice based on this defendant's condition. But more than that, the doctor also noted three specific things this defendant had that made him feel likely, put him in the category of people likely to be successfully treated. And I'm quoting from the third forensic report, absence of severe deficit symptoms, adequate premorbid function, and no evidence of organic etiology. Those are three things Dr. Williams observed about Mr. Shaik specifically that made him confident that there was a high likelihood of success. These particular points, and I don't blame you for reiterating them, they were brought up in your brief. Yes, Your Honor. We're very well aware of them, and you are not waiving anything any more than Mr. Gilbert was waiving anything. So let me ask my co-panelists what questions they have. Do you have any questions? I have none. Thank you. Your Honor, I would just briefly conclude and say that this is the FDA-approved treatment for schizophrenia and that the district court... I know you understand that, and you made that point very squarely. Thank you, Your Honor. We ask that you affirm. Thank you. Mr. Gilbert. Thank you, Your Honor. The reason why the Supreme Court suggests that these cases should be rare is we shouldn't take anybody who has a disease and say, here's the diagnosis, here's the medications that are recommended by the psychiatric community generally to treat that disease no matter what the setting is, and therefore we're going to say that that should fit here. I'd like to address, if I could, very quickly, many of the court's statements about side effects because side effects are significant and, in fact, a big part of the test. It has to be shown substantially unlikely to have these devastating, sometimes fatal, side effects. Within a few minutes after the prosecution inquired about side effects of Dr. Williams, as he was explaining Parkinsonian and movement effects, at page 108 of the record, the district court said, all of this is hypothetical. You don't know that he's going to have a reaction. At page 109, you can't anticipate in advance. You have to just see what the response is. If it's a fatal response, that's rather significant to say, let's just go ahead and see what the response is. After, on cross-examination, when finally I was able to elucidate or asked Dr. Williams to elucidate some of the more severe and even fatal side effects, at page 123, the court says, if all the side effects presented in every person that take the drug, the FDA wouldn't approve it. The same page, the court says, if you ever watched an ad on TV for some medicine they're trying to hack, all they do is talk about the side effects. No one would take it. Let me ask you this. Can you envision a case in which it would be appropriate to administer drugs to a person in the position of your client? Can you? Someone like your client. Is there any conditions under which you think forceful admission of drugs like this is okay? I can't give you exact hypothetical facts, but I think that there are. There may be the rare case where it can be. So in that case that you admit that's true, could not the doctor, would not the doctor still say maybe the same things? He's cooperated as much as he can, but I'm just telling you, when you give somebody drugs, they could have a response we don't anticipate, and they could die. So the fact that somebody could die doesn't seem to me to really make your argument for you. Your Honor, it comes down to the question of did the doctor actually just state the conclusion, or did the doctor actually show us how and why this medication is not going to have these other side effects. But no, you said you could die and it could be fatal, and you made some point about that. But my point is, even in a situation where you admit the law would be followed, it would be appropriate to administer that drug, even that rare case, but you admitted there could be that case, and I'm just saying for a doctor to give that response doesn't seem all unreasonable. Go, we've done everything we can. We know everything about this person we're going to administer drugs to, but I've got to be honest with the court. He could have a fatal response to it. That doesn't seem to me to disqualify the use, that statement about possible fatal response, to disqualify use of the drug. I would hope that the court in that case, Your Honor, if the doctor said that, would want to inquire more and want to seek assurances from the doctor as to why the doctor believed it would be substantially unlikely to have that or many of the other serious, permanent, horrible side effects that virtually every one of these contain. The other thing, Your Honor, is that there's so much testimony by Dr. Williams that wasn't addressed by the court. The court did not, just basically ignored any of the information by Dr. Williams that would have led to the conclusion that the government has not established their case. The doctor said all antipsychotics carry the risk of neuroleptic malignant syndrome at joint appendix page 122, joint appendix 116, cardiac arrhythmia, sudden heart failure, and in fact, maybe the most significant thing that Dr. Williams said and admitted at the trial, which was not addressed at all by the court, is on page 129. When Dr. Williams admitted, after the date of the last study, the one that was cited by the government in this case, Dr. Williams and his colleagues went to courts and said, you know, this person can't be made competent. We need to make him competent. We're sure, we're telling you, it's substantially likely they'll be rendered competent, and they were allowed to do that, and in ten of those cases, he admitted, that person was not restored despite their efforts. So they come out every time and say, you know, here's my opinion. They basically do a talismanic incantation of the four prongs. They don't specifically address it to Mr. Sheikh, and that's why this court. I'm going to ask you to conclude quickly, please. Yes, sir. That's why this court should not allow them, because if you allow it in this case, and in light of all the rest of the cases that this court has decided, if you allow it in this case, there's no case where the government wouldn't be able to say, serious crime, we need to stick him with this medicine and see what happens. Thank you, Your Honor. I'm not sure. It seems to me all of these cases depend on the particular individual and the experts and the particular testimony that's presented. But anyway. Your Honor, if I may ask the court's indulgence, I just wanted to address one thing, and that's the multiple examinations that you talked about since I was there. The first one, I was concerned, and so I asked for him to be evaluated. Dr. Koenig evaluated him at FCI Butner, said he's competent. It was very rapidly clear to me that something was still wrong. So I went back and I asked the court. The court did allow a second exam. Counsel, I really am going to ask you to wrap it up very quickly. Yes, sir. Your general point is you think that some of these competency hearings and everything were cursory. No. Your Honor, I think that the first two evaluations, they got us to where we needed to be. Is he competent? And then when it came to now does the government satisfy the test, I ask you to find that the district court erred when it said that they did. Thank you, Your Honor. Thank you, Mr. Gilbert. We appreciate it. All right. We'll come down and recounsel and move into our final case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Dennis W. Shedd